**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SENTINEL INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 6438** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **WALSH CONSTRUCTION COMPANY,** | ) | |
| **GENESIS STRUCTURES, INC., OLD** | ) | |
| **REPUBLIC INSURANCE COMPANY,** | ) | |
| **and ANDREA QUIGLEY, as administrator** | ) | |
| **of the estate of James Quigley,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity case, plaintiff, Sentinel Insurance Company ("Sentinel"), has filed a motion for summary judgment, seeking a declaration that it owes no duty to defend and indemnify Walsh Construction Company ("Walsh") or Genesis Structures, Inc. ("Genesis"), for claims brought against them in a recent lawsuit stemming from the accidental death of James Quigley, an ironworker. Walsh opposes Sentinel's motion and moves for summary judgment on its counterclaim. For the following reasons, Sentinel's motion is denied and Walsh's motion is granted in part. Sentinel had a duty to defend Walsh, and because Sentinel breached its duty, it is estopped to assert policy defenses.

## BACKGROUND

Walsh served as the general contractor on a construction project ("the Project") that lowered the streets that intersect at South Brainerd Avenue, South Torrence Avenue, and East 130th Street in southern Chicago and simultaneously realigned and raised the railroad tracks so

traffic could pass beneath them. (Walsh LR 56.1 Stmt. ¶ 8, ECF No. 35.)[1] On April 9, 2012, James Quigley, an ironworker for S&J Construction Company, Inc. ("S&J"), one of the subcontractors hired to perform work on the project, was crushed by a steel post that fell out of its rigging during the erection of a steel truss system. (*Id.* ¶ 10) His estate filed suit ("the Quigley suit") against Central Contractors Service, Inc., the subcontractor that was operating the crane from which the truss post was suspended at the time of the accident, and Walsh on April 12, 2012, asserting three counts against Walsh: negligence under the Wrongful Death Act, 740 ILCS 180/1 *et seq*; negligence in premises liability; and a claim under the Illinois Survival Act. (*Id.* ¶ 9.)

The estate alleged that Walsh was "present during the course of [the] erection and construction" during which Quigley was killed; it "participated and coordinated in the work being done and designated various work methods, maintained and checked work progress and participated in scheduling of the work and the inspection of the work"; it "had the authority to stop the work, refuse the work and materials and order changes in the work"; it "managed, supervised and oversaw the erection of a steel bridge truss system consisting of numerous pieces of steel beams, plates and truss posts"; it bore responsibility for "management, supervision and oversight of the construction site and work being done thereon to prevent injury to those engaged in work upon said construction site"; and it committed negligent acts and omissions, including failing "to ensure the steel components of the truss system, in particular the truss posts, had

---

[1] Sentinel's motion to strike certain paragraphs of Walsh's Local Rule 56.1 Statement, or alternatively to permit Sentinel to take relevant discovery pursuant to Federal Rule of Civil Procedure 56(d), is denied. The motion is partially mooted by Old Republic Insurance Company's disclosure of the policy it issued to S&J Construction Company, which is attached to Old Republic's motion for leave to file a cross-claim. (ECF No. 90-2.) As for the remaining paragraphs, paragraphs 8, 11, 13-15, 18, 24, and 36 of Walsh's Local Rule 56.1 Statement, the motion is denied because the facts asserted in these paragraphs are not material to the Court's decision. To the extent the Court cites these paragraphs in this Opinion, it does so only as background and additional context. The Court will disregard these paragraphs to whatever extent, if any, they contain any material fact as to which there might be a genuine dispute.

erection aids or holes bored into the post for purposes of assisting in the erection of said component pieces when [Walsh] knew, or in the exercise of ordinary care should have known, that these were necessary components of the truss posts for the safety of the ironworkers during the erection of the truss system" and failing "to coordinate with the architect and engineers of record regarding the erection aids, erection manual, erection plans or procedural outline for the erection of the various components of the bridge truss system." (*Id.*, Ex. 1-A, Quigley Compl. ¶¶ 3, 4, 8, ECF No. 35-1 at 9-10).

Walsh tendered its defense of the Quigley suit to Old Republic Insurance Company ("Old Republic"), claiming coverage as an additional insured under a policy Old Republic issued to S&J. (*Id.* ¶ 13.) Old Republic did not immediately respond to the tender. (*Id.* ¶ 14.) Walsh reviewed its records pertaining to the Project and discovered that its subcontract with Genesis Structures, Inc. ("Genesis"), an engineering firm that had been involved in the preparation of the steel truss system, required Genesis to obtain primary and non-contributory insurance covering Walsh for the Project. (*Id.* ¶¶ 15-16.) Walsh then tendered its defense to Genesis's insurer, Sentinel Insurance Company ("Sentinel"). (*Id.* ¶ 17.)

Sentinel issued Genesis a "Spectrum Policy," which provided several different types of coverage. Under the terms of the policy's "business liability coverage," Sentinel promised to (a) "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury" caused by an "occurrence" (or accident), and (b) "defend the insured against any suit seeking those damages." (Compl. ¶ 19, ECF No. 1 (internal quotation marks omitted).) The term, "the insured," refers not only to Genesis, the policyholder identified as the "named insured" on the policy's declarations page (*id.*, Ex. G, Sentinel Policy, Declarations, ECF No. 1-7 at 6), but also potentially to other persons or organizations, "when [Genesis has] agreed, in a

written contract [or] written agreement[,] . . . that such person or organization be added as an additional insured on [its] policy." (*Id.*, Ex. G, Business Liability Coverage Form, Part C.6., ECF No. 1-7 at 102-03.) When there is such an agreement, the policy covers the "additional insured," but, as relevant here, "only with respect to liability for bodily injury . . . caused, in whole or in part, by [Genesis's] acts or omissions or the acts or omissions of those acting on [its] behalf . . . in the performance of [its] ongoing operations." (*Id.*, Ex. G, Part C.6.f., ECF No. 1-7 at 104 (internal quotation marks omitted).) A general condition of the business liability coverage is that "this insurance applies . . . [s]eparately to each insured against whom a claim is made or suit is brought." (*Id.*, Ex. G, Liability and Medical Expenses General Conditions, Separation of Insureds, Part E.5, ECF No. 1-7 at 107.)

The Sentinel policy contains a number of provisions that exclude coverage for "professional services" as follows:

1. This insurance does not apply to bodily injury . . . arising out of the rendering or failure to render any professional services by:
   a. Any insured; or
   b. Any engineering, architectural or surveying firm that is performing work on your behalf in such capacity.
2. Professional services include:
   a. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; and
   b. Supervisory, inspection, architectural or engineering activities.

(*See, e.g.,* Compl., Ex. G, Engineers, Architects or Surveyors Professional Liability Exclusion Endorsement, ECF No. 1-7 at 116 (internal quotation marks omitted); *id.*, Ex. G, Business Liability Coverage Form Exclusion j., ECF No. 1-7 at 97.)

Sentinel denied coverage in a letter dated December 27, 2012, asserting that its policy did not cover "professional errors and omissions" of Genesis and that since Genesis had not been

asked to design a truss post rigging system, the failure of the rigging system was not caused by Genesis. (*Id.* ¶ 18; *id.*, Ex. 1-E, ECF No. 35-1 at 42-49.)

On May 9, 2013, in the Quigley suit, the Quigley estate filed a first amended complaint ("FAC"), this time naming Genesis as a defendant and asserting a negligence claim against it, and on June 4, 2013, Genesis tendered the FAC to Sentinel for defense and indemnity. (*Id.* ¶¶ 21-22.) In November 2013, having received no further communication from Sentinel since the December 27, 2012 letter, Walsh filed a declaratory judgment action against Old Republic and Sentinel in the Circuit Court of Cook County, seeking to resolve the coverage issue. (*Id.* ¶¶ 23-24.) Walsh twice attempted to effect service via the Cook County Sheriff and the Illinois Department of Insurance, but in February 2015, Sentinel filed a motion to dismiss, arguing that service was improper. (*Id.* ¶ 24.) The Circuit Court of Cook County granted Sentinel's motion on July 23, 2015, and Sentinel filed this action on the same day. (*Id.* ¶ 25.)

Walsh and Genesis filed counterclaims. Walsh's counterclaim consists of three counts, seeking (1) a declaration that Sentinel owes it a duty to defend and indemnify for the Quigley lawsuit, and an award of costs, prejudgment interest, and other appropriate relief, (2) a declaration that Sentinel is estopped to assert policy defenses against Walsh, and an award of costs, prejudgment interest, and other appropriate relief, and (3) relief under Section 155 of the Illinois Insurance Code, which penalizes insurers for vexatious or unreasonable actions or delays in handling claims.

## ANALYSIS

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court must view all evidence and

draw all inferences in favor of the non-moving party. *See Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A "genuine" dispute is one that could change the outcome of the suit, and is supported by evidence sufficient to allow a reasonable jury to return a favorable verdict for the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

Sentinel contends that it is entitled to summary judgment because, based on the professional services exclusion, the policy did not even potentially cover Walsh for the Quigley lawsuit. Walsh contends that the professional services exclusion does not apply and Sentinel breached its duty to defend by refusing Walsh's tender. According to Walsh, because Sentinel wrongfully denied Walsh's claim without timely seeking a declaratory judgment of no coverage, Sentinel is estopped to assert policy defenses.

## I. PROFESSIONAL SERVICES EXCLUSION AND THE DUTY TO DEFEND

A commercial general liability insurer owes two essential, overarching duties to its insured: a duty to defend and a duty to indemnify. The duty to defend is broader than the duty to indemnify because it arises when the insured faces a suit in which the complaint contains allegations falling "within or *potentially* within policy coverage . . . even if the allegations are groundless, false or fraudulent." *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods*

*Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005) (emphasis added).[2]  In contrast, the duty to indemnify arises only after the insured "has incurred liability as a result of the underlying claim," and then "only if 'the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage,'" based on the factual determinations made in the underlying action. *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 492 (Ill. 2001).  In considering whether an underlying complaint triggers an insurer's duty to defend, the underlying complaint is to be "liberally construed in favor of the insured, and doubts and ambiguities are to be construed in favor of the insured."  *Lyons v. State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 722 (Ill. App. Ct. 2004).

Sentinel argues that it never even potentially had any duty to defend Genesis or Walsh in the Quigley suit because the policy's professional services exclusion ("PSE") bars coverage for any claim arising out of "professional services" performed by "any insured," so there was never any potential for coverage for any claim arising out of the engineering services performed by Genesis.  According to Sentinel, the exclusion bars Walsh's claim, even if Walsh did not perform engineering services itself, because the underlying claim against Walsh arose out of the engineering services Genesis performed and therefore fell within the PSE.   According to Sentinel, the exclusion's "any insured" language serves to "bar coverage for *all* insureds when *one* insured commits an act falling within the policy exclusion."  (Sentinel Mem. in Supp. of Mot. for Summ. J. at 8, ECF No. 25 at 10 (citing *Thoele v. Aetna Cas. & Sur.*, 39 F.3d 724, 727 (7th Cir. 1994)).

---

[2] The parties do not dispute that Illinois law applies.  *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) ("A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits.").

Walsh responds that several courts have rejected Sentinel's interpretation of the PSE, particularly where, as here, the policy contains a "separation of insureds" clause. *See Patrick Eng'g Inc. v. Old Republic Gen. Ins. Co.*, 973 N.E.2d 1036, 1044-46 (Ill. App. Ct. 2012); *U.S. Fid. & Guar. Co. v. Shorenstein Realty Servs., L.P.*, 700 F. Supp. 2d 1003, 1011-12 (N.D. Ill. 2010) *aff'd Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Motorists Ins. Co.*, 707 F.3d 797, 802 (7th Cir. 2013) (citing *Patrick Eng'g*); *City of Chi. v. St. Paul Fire & Marine Ins. Co.*, No. 97 C 5756, 1998 WL 111564, at *2-4 (N.D. Ill. Mar. 11, 1998). These decisions reason that, when the policy contains a "separation of insureds" clause, which provides that the policy applies "separately to each insured against whom a . . . suit is brought," then the critical question in determining whether the PSE applies is not whether the underlying claim arises out of "professional services" performed by "any insured," but whether the underlying claim or suit against the particular insured seeking coverage arises out of *that particular* insured's rendering of or failure to render professional services, regardless of whether the underlying accident arose out of another insured's professional services.

Sentinel replies that these cases are either distinguishable based on the policy language, which in all but *Shorenstein*, did not include the "by any insured" language that the PSE in the Sentinel policy contains, or inconsistent with *Thoele*, 39 F.3d at 727, which held that where a policy contained an exclusion barring coverage for claims arising out of the "business pursuits" of "any insured," "the choice of the word 'any' broadened the exclusion to include injuries triggered by one insured in connection with the business pursuit of another." Similarly here, according to Sentinel, the use of the phrase "any insured" broadens the PSE to exclude coverage for bodily injury claims against Walsh "in connection with" the professional services performed by Genesis.

Even assuming *arguendo* that Sentinel is correct that consideration of the separation of insureds clause would not have altered the result in *Thoele*,[3] it does not follow that Sentinel should prevail. *Thoele* is distinguishable from this case. In *Thoele*, the Court had "no doubt" that the exclusion applied because the policy specifically cited "home day care services" as an example of an excluded "business pursuit," and the underlying harm had unquestionably arisen out of home day care services provided by an insured. But from the allegations of the complaint in the Quigley suit, it is not clear whether Quigley's accident genuinely arose out of excluded "professional services" such as engineering activities. The duty to defend is triggered if there is even the *potential* for coverage, and "an exclusions clause denying coverage will be applied only if its applicability is clear and free from doubt." *Founders Ins. Co. v. Sheikh*, 2017 IL App (1st) 170176, ¶ 12.

In *City of Chicago v. St. Paul Fire & Marine Insurance Co*., the City of Chicago sought coverage as an additional insured, under a policy issued to an engineering firm subcontractor, for an accident arising out of construction work done on the Chicago Skyway. The City did not dispute that the underlying accident "potentially resulted" from professional services provided by the named insured engineering firm, but the City argued that its "potential liability [also arose] from its own alleged negligence or from its status as the property owner." *City of Chi.*, 1998 WL 111564, at *3. According to the City, the engineering firm's insurance policy did not "exclude coverage for injuries resulting from the City's negligence, where those injuries also result[ed]

---

[3] It is far from clear that this assumption is correct. As Walsh notes, although the policy in *Thoele* contained a "severability" clause with language similar to the language of the separation of insureds clause in the Sentinel policy, the Seventh Circuit explicitly declined to address its effect, deeming any argument on the point waived. According to Walsh, and as the court explained in *Shorenstein*, a separation of insureds clause means that "the professional services exclusion must be applied vis a vis [each insured's] own conduct," and it does not apply to a claim against an additional insured, such as Walsh, that did not "perform professional services in connection with the project." *See Shorenstein*, 700 F. Supp. 2d at 1015.

from work done by or for [the engineering firm] (even assuming [the engineering firm's] work was solely professional in nature.)" *Id.* The court agreed with the City, reasoning as follows:

> True, the policy requires the covered injury or damage to result from work done by or for [the named insured engineering firm], and [the engineering firm] may have only done professional work. But the policy does not speak clearly to the situation presented here: injuries that allegedly result from both (1) work done by [the engineering firm] and (2) the additional insured's negligence. The City presents a reasonable argument that the severability clause renders the professional services exclusion inapplicable here. At the very least, its applicability is not free from doubt. Accordingly, the exclusion does not apply.

*City of Chi.*, 1998 WL 111564, at *4 (internal quotation marks omitted). This case is similar because it is unclear from the allegations of the underlying lawsuit, even assuming that Genesis provided only engineering services on the Project,[4] whether it was the actions or omissions of Genesis, Walsh, or both that caused the accident. *Patrick Engineering*, *Shorenstein*, and *City of Chicago* all recognized that the applicability of the PSE is not "clear and free from doubt" if it is not certain what role, if any, the professional services played in the underlying accident. *See Patrick Eng'g, Inc.*, 973 N.E.2d at 1043-44 (citing *City of Chi.*, 1998 WL 111564, at *3-4), *Shorenstein*, 700 F. Supp. 2d at 1014 (same). "Given that an insurer must defend an insured if a suit merely potentially falls within the terms of the policy and that an exclusion['s] applicability must be free from doubt in order to preclude coverage," *Patrick Eng'g*, 973 N.E.2d at 1044, and given the uncertainty about whether the underlying claim in this case arose out of the provision of professional services, Sentinel had a duty to defend Walsh in the Quigley suit.

---

[4] Sentinel proffers extrinsic evidence (*i.e.*, evidence other than the terms of the policy and the allegations of the underlying complaint) about what sort of services Genesis generally provides, and the parties argue at length about how much and what sort of extrinsic evidence the Court may consider in determining whether Sentinel had a duty to defend. The parties seem to agree that the Court can consider the subcontract between Walsh and Genesis (*see* Walsh Mem. at 6, ECF No. 34), but Walsh argues that no other extrinsic evidence should enter into consideration and moves to strike any such evidence from the record. But the Court need not reach these arguments because, even if it assumes, as Sentinel seeks to demonstrate with extrinsic evidence, that Genesis provided only engineering services, Walsh still prevails. Walsh's motion to strike is denied.

Sentinel cites only one case, *Hartford Casualty Insurance Co. v. Juneau Associates, Inc., P.C.*, No. 14-CV-0826, 2015 WL 11439066, at *1, *3-4 (S.D. Ill. Dec. 7, 2015), in which a court interpreted the PSE—in a policy apparently identical to Sentinel's—to bar coverage in circumstances analogous to those of this case. In *Juneau Associates*, an "engineering and construction management firm" sought coverage when the estate of an electrocuted laborer brought suit, alleging that the insured firm was negligent for failing to "raise overhead power lines when it was known that oversized vehicles would be working beneath them and in failing to post warnings regarding the presence of the uninsulated overhead power lines." [5] The Court ruled that the exclusion applied because, even if these allegations did not concern traditional "professional" services requiring a professional license, such as engineering, they were at least "supervisory" or "inspection" activities, which also fall within the exclusion's definition of "professional services." *Id.* at *6.

This reasoning finds some support in the policy language, and some courts in other jurisdictions[6] have agreed that some of the duties that typically fall within the ambit of a general

---

[5] Sentinel also cites *Archer Daniels Midland Co. v. Burlington Insurance Co. Group*, 785 F. Supp. 2d 722, 734 (N.D. Ill. 2011) ("*ADM*"), which followed *Thoele*, and explicitly declined to follow *Shorenstein*, in interpreting an exclusion's "any insured" language in favor of the insurer. But *ADM* is distinguishable because it involved a cross-liability exclusion, not a PSE, as the Illinois Appellate Court explained in *Patrick Engineering*:

> [W]e reject [the insurer's] argument that the professional-services exclusion in this case should be applied similarly to the cross-liability exclusion in [*ADM*]. In [*ADM*], the court found that the policy's separation-of-insureds clause did not allow for one insured to sue another where the policy's cross-liability exclusion precluded just that. 785 F. Supp. 2d] at 729. [*ADM*], which involves the (lack of) interplay between a separation-of-insureds clause and a cross-liability exclusion, does not provide this court with more guidance than *Shorenstein* and *City of Chicago*, which involve the interplay between a separation-of-insureds clause and a professional-services exclusion, as is at issue before us.

73 N.E.2d at 1044-45.

[6] The Court is aware of a case, *State Automobile Mutual Insurance Co. v. Habitat Construction Co.*, 875 N.E.2d 1159, 1168 (Ill. App. Ct. 2007), in which the Illinois Appellate Court explicitly held that the PSE did not apply to a general contractor, but that case is of limited applicability here because the language of the PSE differed; it explicitly applied only to an "architect's, engineer's, or surveyor's rendering of or

contractor or construction management firm may fall within the PSE. *See, e.g., Erie Ins. Exch. v. Colony Dev. Corp.*, 2003-Ohio-7232, ¶¶ 55-61 (Ohio Ct. App. 2003); *Brosnahan Builders, Inc. v. Harleysville Mut. Ins. Co.*, 137 F.Supp.2d 517, 527 (D. Del. 2001); *but see State Farm & Cas. Co. v. Lorrick Pac., LLC*, No. 03:11-CV-834, 2012 WL 1432603, at *5-6 (D. Or. Apr. 24, 2012) (general contractor's duties in "coordinating" the work of subcontractors do not amount to "supervisory" services within the meaning of the PSE). Further, the Illinois Appellate Court has explained that the term "professional services"

> is not limited to services performed by persons who must be licensed by a governmental authority in order to practice their professions. Rather, it refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature.

*State St. Bank & Tr. Co. of Quincy, Illinois v. INA Ins. Co. of Illinois*, 567 N.E.2d 42, 47 (Ill. App. Ct. 1991) (PSE applied to insured bank's loan collection actions because they "arose from [bank's] exercise of its business judgment in conducting its principal business activity").

But the Illinois Appellate Court has also explained that "professional services" are not just any that "involve the conduct of [the insured's] business"; the requirement that they involve "specialized knowledge, labor, or skill, [or] conduct which is predominantly mental or intellectual as opposed to physical or manual in nature" is critical. *Bonnie Owen Realty, Inc. v. Cincinnati Ins. Co.*, 670 N.E.2d 1182, 1186 (Ill. App. Ct. 1996). In *Bonnie Owen Realty*, the court held that the PSE did not apply to claims against an insured property management firm of "simple negligence . . . in the maintenance of the building." *Id.* In this case, it is not clear that Walsh was alleged to have committed negligence only in "predominantly mental or intellectual" tasks that would necessarily qualify as "professional" in nature; to the contrary, one of the

---

failure to render any professional services." The PSE in this case is written significantly more broadly, as it applies to "professional services" rendered by "any insured," not just an architect, engineer, or surveyor.

negligence counts against it sounded in premises liability. Thus, in this case, as in *Bonnie Owen Realty*, the insurer did not "clearly and specifically," by way of "clear, definite and explicit" terms, exclude all of the conduct Walsh was alleged to have negligently committed, and therefore the Sentinel policy "at least potentially provide[d] coverage for [Walsh], and [Sentinel had] a duty to defend [Walsh] in the underlying suit[]." *See id.*

## II. ESTOPPEL

The Illinois Supreme Court has summarized the estoppel doctrine as follows:

> The general rule of estoppel provides that an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured. Rather, the insurer has two options: (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage. If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage.

*Employers Ins. of Wausau v. Ehlco Liquidating Tr.*, 708 N.E.2d 1122, 1134-35 (Ill. 1999). Walsh argues that because Sentinel breached its duty to defend Walsh in the Quigley suit, it is estopped to assert its remaining policy defenses, including whether Walsh qualifies as an additional insured under the Sentinel policy, whether Sentinel received late notice of the Quigley suit, and whether its policy provides only excess insurance over the Old Republic policy based in its "other insurance" clause. In response, Sentinel argues it is not estopped because (a) it brought a declaratory judgment action before the underlying action was far advanced and (b) its duty to defend was never triggered (and therefore never breached) because its policy was excess over Old Republic's based on its "other insurance" provision.

### A. Timeliness

An insurer that has refused to defend an insured must seek a declaratory judgment of no coverage "promptly" or in a "timely manner" in order to avoid the application of the estoppel

doctrine. *See L.A. Connection v. Penn-Am. Ins. Co.,* 843 N.E.2d 427, 432 (Ill. App. Ct. 2006).

Sentinel argues that it has complied with this obligation by filing this declaratory action well in

advance of the resolution of the underlying action, which did not settle until approximately two

years later. (*See* Reply Br. at 15, ECF No. 57 (citing *St. Paul Fire & Marine Ins. Co. v. Vill. of

Franklin Park*, No. 04 C 8287, 2006 WL 862902, at *7 (N.D. Ill. Mar. 31, 2006) ("[T]he most

important factor . . . is not the raw chronological delay in an insurer's filing a declaratory

judgment action, but whether the insurer waited until trial or settlement was imminent."), *aff'd*

*on other grounds*, 523 F.3d 754 (7th Cir. 2008).)

Walsh argues in response that, while looking to whether trial or settlement is imminent is

one of several approaches Illinois courts have taken to determining whether an insurer's

declaratory action was timely filed, it is not presently their favored approach. In *L.A. Connection*

*v. Penn-Am. Insurance Co.*, 843 N.E.2d 427, 432-33 (Ill. App. Ct. 2006), the Illinois Appellate

Court recognized that it had previously called the progress of the underlying action at the time

the insurer sought declaratory relief "the most important factor" in determining whether the

insurer was estopped, but such statements in earlier cases had to be "viewed in [their] factual

context" and not as "a blanket adoption of the so-called 'imminent resolution' test." Because

"each case must be decided on its own facts," the court "favor[ed] the more flexible 'reasonable

time' test," which best "serves the goal of the estoppel doctrine—enforcement of the duty to

defend." *Id.* at 433; *see State Auto. Mut. Ins. Co. v. Kingsport Dev., LLC*, 846 N.E.2d 974, 987

(Ill. App. Ct. 2006) ("We agree with the *L.A. Connection* court that the 'reasonable time' test is

the best approach to determine whether an insurer timely filed a declaratory judgment action.");

*see also Zurich Specialties London Ltd. v. Vill. of Bellwood, Ill.*, No. 07 CV 2171, 2011 WL

248444, at *10 (N.D. Ill. Jan. 26, 2011) ("Although the Illinois Supreme Court has not yet

decided the issue, this court agrees with those courts that have adopted the [reasonable time] approach."); *FCCI Ins. Co. v. Westfield Ins. Co.*, 2014 IL App (1st) 131598-U, ¶¶ 66-68 (applying reasonable time test without mentioning other alternatives); *Alea London Ltd. v. Rhino Const. & Excavating Co.*, 2015 IL App (2d) 140662-U, ¶¶ 62-63, 68-69 (insurer estopped to deny coverage based on 16-month delay in filing declaratory action, although underlying action was only in discovery phase and resolution was not imminent).[7] This Court agrees with these decisions, and with Walsh, that the proper inquiry is whether Sentinel sought a declaratory judgment of no coverage within a reasonable time.

Even Walsh, however, is not sure how to measure a "reasonable time." In its Local Rule 56.1 Statement, it cites evidence of a variety of different time frames as if any of them might be relevant, including the delay between the date Walsh tendered its defense of the Quigley suit to Sentinel and Sentinel's appearance in the state-court coverage action filed by Walsh (26 months); the delay between the date Walsh tendered its defense of the Quigley suit to Sentinel and the filing of this action (33 months); the delay between the date Sentinel received actual notice of the first amended complaint in the Quigley suit and Sentinel's appearance in the state-court coverage action (19 months); and the delay between the date Sentinel received actual notice of the first amended complaint and the filing of this action (26 months).

To avoid application of the estoppel doctrine, an insurer need not be the one to have filed the action in which it seeks a declaration of no coverage; "[i]t is the fact of the proceeding itself, and not the identity of the party initiating the proceeding, that is of legal import." *L.A. Connection*, 843 N.E.2d at 431 (citing *Ayers v. Bituminous Ins. Co.*, 424 N.E.2d 1316, 1318 n. 1 (Ill. App. Ct. 1981)). "While there need not be a race to the courthouse and the insured should

---

[7] The Court recognizes that *FCCI* and *Rhino* are unpublished, nonprecedential decisions of the Illinois Appellate Court. They are cited here not for their precedential value but merely for the persuasive value of their reasoning, in the same manner that the Court cites other district court decisions.

not be able to estop the insurer from asserting policy defenses by filing a complaint for declaratory judgment first, the insurer must take some action to adjudicate the issue of coverage or undertake to defend the insured under a reservation of rights, and it must take that action within a reasonable time of a demand by the insured." *Korte Constr. Co. v. Am. States Ins.*, 750 N.E.2d 764, 769-70 (Ill. App. Ct. 2001). What an insurer cannot do is "'simply stand on the sidelines'" while the underlying action proceeds, without taking any action either to defend the insured or to resolve the coverage dispute by way of a declaratory judgment. *W. Am. Ins. Co. v. J.R. Const. Co.*, 777 N.E.2d 610, 620 (Ill. App. Ct. 2002) (quoting *Cent. Mut. Ins. Co. v. Kammerling*, 571 N.E.2d 806, 810 (Ill. App. Ct. 1991)).

Relying on these core principles for guidance, the Court finds that the relevant time frame is the time between Walsh's tender of its defense of the Quigley suit to Sentinel and Sentinel's appearance in the state-court coverage action. As the Court has explained, Walsh's tender of its defense to Sentinel in October 2012 triggered Sentinel's duty to defend because Walsh was at least potentially covered under Sentinel's policy based on the allegations against it in the Quigley suit. Sentinel's first action that might be construed as a step toward seeking a judicial resolution of the coverage dispute was its appearance in the coverage action Walsh filed in the Circuit Court of Cook County in January 2015.[8] (Walsh LR 56.1 Stmt., Ex 2, Morrissey Aff., Ex. 2-B,

---

[8] It is arguable that even appearing in the state-court coverage action is not a sufficiently substantial step toward resolving coverage to discharge Sentinel's duty under the estoppel doctrine because, even after it appeared in the state-court coverage action, Sentinel's first action was to move to dismiss for improper service, and it never took any action to affirmatively seek a declaration of no coverage until it filed this action in July 2015. In *Massac County v. United States Fiduciary and Guaranty Co.*, 446 N.E.2d 584, 588 (Ill. App. Ct. 1983), the Illinois Appellate Court explained that, even if an insurer need not be the party that files the declaratory coverage action to escape estoppel, it must actually seek to "determine the rights and obligations of the parties to the policy" in that action; filing a motion to dismiss has the opposite effect and therefore does not prevent the application of the estoppel doctrine against the insurer. In this case, the record of proceedings in the state-court coverage action is fuzzy, and given that Sentinel opposes summary judgment on this issue, the Court must interpret the facts in the light most favorable to Sentinel, so it assumes without deciding that Sentinel's appearance in the state-court coverage action was a manifestation of Sentinel's "desire[ for a] determination of rights under the policy." *Id.*

ECF No. 35-2 at 10-11.)  That was more than two years after Sentinel rejected Walsh's tender. "[D]elays of over a year have been found unreasonable by courts employing the reasonable time test."  *Zurich Specialties London Ltd. v. Vill. of Bellwood, Ill.*, No. 07 CV 2171, 2011 WL 248444, at *10 (N.D. Ill. Jan. 26, 2011) (citing cases); *see, e.g., J.R. Constr.*, 777 N.E.2d at 620 ("[Insurer's] failure to take the necessary action for 21.5 months from the time the defense was tendered was unreasonable as a matter of law.").  Sentinel's two-year delay was unreasonable, and therefore Sentinel is estopped from asserting coverage defenses.[9]

### B. "Other Insurance" Provision

Sentinel initially took the position that the estoppel issue was not ripe for resolution without discovery, particularly while the terms of the Old Republic policy issued to S&J were unknown.  However, after the settlement of the Quigley suit, Old Republic filed a motion for leave to assert a crossclaim in this case, attaching its policy as an exhibit to the motion.  Now that it has knowledge of the terms of the Old Republic policy, Sentinel seeks leave to file a supplemental brief and additional statement of facts, arguing that it never had a duty to defend Walsh because (a) by the terms of the Old Republic policy, Old Republic provided Walsh with primary insurance, (b) by its own terms, Sentinel's policy was always excess over any "other insurance" that might be applicable on a primary (rather than excess) basis, and (c) by the terms of its policy, Sentinel had no duty to defend when its policy was excess, so (d) Old Republic alone bore the duty to defend Walsh in the Quigley suit.

Sentinel's motion is denied as futile.  Its argument is unavailing for two reasons.  First, Sentinel has not demonstrated that the Sentinel policy is excess over the Old Republic policy.

---

[9] As stated above, Walsh's counterclaim contains a section 155 claim for unreasonable and vexatious delay, but it does not discuss this claim in its briefs, and at this stage the record does not show that Sentinel acted not only slowly but in bad faith.  Walsh's motion for summary judgment is denied as to the section 155 count.

Unlike in the case Sentinel cites, *River Village I, LLC v. Central Insurance Cos.*, 919 N.E.2d 426, 437 (Ill. App. Ct. 2009), the evidence shows that the named insureds S&J and Genesis both signed written agreements requiring them to obtain primary and non-contributory insurance covering Walsh for the Project. (*Compare* Genesis/Walsh Subcontract, Walsh 56.1 Stmt. Ex. 1-B, ECF No. 35-1 at 23-24, 32-33, *with* S&J/Walsh Subcontract, Mot. for Leave to File Cross-Claim Ex. A, ECF No. 90-1 at 23-24.) Further, the Old Republic policy contains "additional insured" and "other insurance" provisions that are materially similar to the ones in the Sentinel policy, in the sense that they provide (a) that the policy covers as an additional insured any entity for whom the named insured is required by contract to procure insurance coverage and (b) that the insurance is primary, but excess over other available primary insurance. (*Compare* Sentinel Policy, Business Liability Coverage Form Parts C.6.f. and E.7, ECF No. 26-2 at 73-74, 76-77, *with* Old Republic Policy, Mot. for Leave to File Cross-Claim Ex. B, Section IV.4 and Changes Additional Insured Primary Wording Schedule Endorsement, ECF No. 90-2 at 18-19, 48.)

Even in *River Village*, the Illinois Appellate Court recognized that when two policies both contain "other insurance" provisions with "excess" clauses—*i.e.*, when both policies provide that they are primary unless the insured is covered by other available primary insurance, in which case they are excess—then the "other insurance" provisions cancel out and the insurers share duties as co-primary insurers. 919 N.E.2d at 437 (citing *Ohio Cas. Ins. Co. v. Oak Builders, Inc.*, 869 N.E.2d 992, 997 (Ill. App. Ct. 2007)). Critically, even if the "other insurance" provisions and "excess" clauses "do not contain identical verbiage," so long as the effect of both policies is that they essentially provide primary insurance that is only excess in the event that other primary insurance is available, then the "excess" clauses "are mutually repugnant and cancel each other out since the only way to give effect to one insurer's intention

18

would be arbitrarily to read one policy's excess clause first and undermine the intention of the insurer whose policy's 'excess' insurance clause was read second." *Oak Builders*, 869 N.E.2d at 997. Sentinel points to "excess" and "other insurance" language in Old Republic's policy and baldly asserts that this language can be reconciled with the "other insurance" language in Sentinel's policy to provide that Sentinel's policy was excess over Old Republic's. While, as in *Oak Builders*, the "verbiage" of the excess clauses may not be "identical," the Court fails to see any material difference in effect. It appears that both policies provided primary coverage, and therefore the insurers shared the duty to defend.

Sentinel also cites Part E.2.e of its policy, the Additional Insured's Other Insurance provision, which states, "If we cover a claim or 'suit' . . . that may also be covered by other insurance available to an additional insured, such additional insured must submit such claim or 'suit' to the other insurer for defense and indemnity." But Sentinel does not cite the second paragraph of Part E.2.e., which states, "However, this provision does not apply to the extent that [the named insured has] agreed in a written contract, written agreement or permit that this insurance is primary and non-contributory with the additional insured's own insurance." That is precisely what Genesis and Walsh agreed in Exhibit D of the Genesis/Walsh Subcontract. (Walsh LR 56.1 Stmt., Ex. 1-B, ECF No. 35-1 at 33.) Thus, when read in light of the terms of the relevant policies and subcontracts, Sentinel's proposed supplemental brief does not demonstrate that Sentinel had no duty to defend Walsh because it provided Walsh only with excess insurance.

But in the end none of this makes any difference. Even if Sentinel correctly interprets the policies' "other insurance" provisions, it is only raising a policy defense of the sort it is estopped to assert because it breached its duty to defend. *See J.R. Constr.*, 777 N.E.2d at 614-20 (insurer

estopped to assert that general contractor was not covered as an additional insured by policy issued to subcontractor), *Korte Constr.*, 750 N.E.2d at 458-59 (insurer estopped to assert that its policy was excess over other available primary insurance).

Sentinel argues that it cannot have breached its duty to defend if it never had one, but as the Court has explained above, the parties intended for Sentinel's policy to afford Walsh primary coverage for the Project, and there was at least the *potential* that Walsh was covered by the Sentinel policy in the Quigley suit. Sentinel had a duty to defend, and it was therefore required either to defend under a reservation of rights or bring a timely declaratory judgment action. It did neither, so it is estopped to assert policy defenses, including any defense based on the "additional insured" or "other insurance" provisions in its policy.

## III. OLD REPUBLIC'S MOTION FOR LEAVE TO FILE CROSSCLAIM

After the parties resolved the underlying Quigley suit, Old Republic moved this Court for leave to file a crossclaim against Walsh for reimbursement of amounts it contributed to Walsh's defense and settlement of the Quigley suit, in the event that Walsh prevails on its counterclaim against Sentinel. (Old Republic Mot., ECF No. 90.) Walsh opposes the motion, arguing that it will be prejudiced by Old Republic's undue delay in waiting to file its crossclaim until over two years after this lawsuit was filed.

According to Federal Rule of Civil Procedure 13(g), "[a] pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim." The rule does not prescribe any particular time frame for filing crossclaims, so when a party seeks to file a crossclaim at an advanced stage of the case, the district court, in the exercise of its discretion,

must determine whether to allow the crossclaim by balancing competing interests and harms against one another:

> Rule 13(g) does not prescribe a time limit within which a party must present a crossclaim. The decision whether to allow a crossclaim that meets the test of subdivision (g) is a matter of judicial discretion. No precise standards have been formulated. ***Generally, most courts balance the interests of judicial economy and the general policy of avoiding multiple suits relating to the same events against the possibilities of prejudice or surprise to the other parties and decide the question of timeliness accordingly.*** As stated by one Pennsylvania district court judge:
>> It is true, of course, that this court can and will control third-party actions and cross-claim actions in such a way that justice will be done to all the parties and the bringing of the original action to trial will not be retarded by them, but in the absence of a showing of injustice to someone or a delay of the trial, no arbitrary time limitation without an express rule of court will be imposed.

6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1431 (3d ed. 1998) (April 2017 Update) (quoting *Fogel v. United Gas Imp. Co.*, 32 F.R.D. 202, 203-04 (E.D. Pa. 1963).  In this case, balancing the general public policy in favor of judicial economy and avoiding multiple suits relating to the same events, on the one hand, against the potential for prejudice to Walsh, on the other hand, the Court concludes that concerns of judicial economy predominate over concerns of prejudice.  Although the Court concludes that Sentinel breached its duty to defend and is estopped to assert coverage defenses, no award of damages or other monetary relief has been made—or indeed sought, in any specific amount.  The Court fails to see why Walsh is prejudiced by the need to reduce any recovery it may obtain by any amount that may be due to Old Republic if Old Republic has paid for more than its share of its coverage obligations in this matter.  Even if there is any prejudice, it is outweighed by the Court's concern for judicial economy, which is served by resolving as much of the parties' dispute as possible in this proceeding, rather than requiring Old Republic to file a separate case.  Old Republic's motion for leave to file a crossclaim is granted.

## CONCLUSION

For the reasons set forth above, the Court denies Sentinel's motion for summary judgment [25] and grants in part Walsh's motion for summary judgment [31]. Walsh's motion is granted in part as to the declaratory relief requested in Counts I and II of its counterclaim. Sentinel had a duty to defend Walsh, and because Sentinel breached its duty, it is estopped to assert policy defenses. Walsh's motion is otherwise denied. Walsh's motion to strike [33] is denied. Sentinel's motion to strike [58] is denied. Sentinel's motion for leave to file a supplemental brief and additional statement of facts [94] is denied. Old Republic's motion for leave to file a crossclaim [90] is granted. A status hearing is set for February 9, 2018 at 9:30 a.m.


**SO ORDERED.**                                   **ENTERED: January 16, 2018**


_____
**HON. JORGE L. ALONSO**
**United States District Judge**